UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES<br>v.<br>RAYMOND TERMINI | No. 3:10-cr-5 (SRU) |
| UNITED STATES<br>v.<br>FRED DALICANDRO | No. 3:09-cr-245 (SRU) |

# RESTITUTION ORDER

Between August and November 2007, the defendants, Fred Dalicandro and Raymond Termini, defrauded Omega Health Care Investors, Inc. ("Omega").[1] The fraud occurred in connection with Termini's position as chief executive officer and managing member of Haven Healthcare ("Haven"), and Dalicandro's position as Director of Cash Management for Haven.

Haven operated several nursing homes throughout Connecticut, including two owned by Omega—Haven Health Center of Jewett City and Haven Health Center of Soundview. During 2006 and 2007, the State of Connecticut mandated that nursing homes install fire sprinklers, and thus, in fall 2007, Omega agreed to provide up to $2 million for Haven to make sprinkler improvements in the Jewett City and Soundview facilities. The funding was to be recouped by an increase in base rent that Haven paid to Omega.

On October 2, 2007, Omega wired $418,480 to the Jewett City residence, and $537,610 to the Soundview residence (for a total of $956,090), as reimbursement for various invoices that turned out to be false or misleading. Rather than being used for the actual costs of sprinkler systems in those two residences, that money was put into Haven's operating accounts, and on

---

[1] Omega has a subsidiary that operates in Connecticut named OHI (Connecticut), Inc. Throughout this order, OHI (Connecticut) will also be referred to as Omega.

October 31, 2007, was used to pay part of over $2.1 million in provider taxes Haven owed the State of Connecticut. Haven filed for bankruptcy in November 2007 and had substantially no assets by June or July 2008. In July 2008, Omega entered into a lease with a different company—TC Healthcare I, LLC ("TC Healthcare")—to operate the Soundview and Jewett City facilities.

Termini pled guilty to conspiracy to commit wire fraud in violation of 18 U.S.C. § 371 and wire fraud in violation of 18 U.S.C. § 1343. Dalicandro pled guilty to wire fraud in violation of 18 U.S.C. § 1343. Termini was sentenced to a year and a day of imprisonment and three years of supervised release, in addition to a $6,000 fine. Because restitution is mandatory by statute but appeared potentially complex in this case, it was not immediately ordered but instead the criminal judgment included a restitution provision as follows: "Restitution: A restitution order will issue." Dalicandro was sentenced to pay a $2,500 fine and his criminal judgment provided as follows: "Restitution: A written order will issue following a hearing on October 8, 2010." Several hearings on the matter of restitution were held, in May and October 2010 and August 2011, and additional briefing was submitted. It recently came to my attention, however, that no order issued, and I therefore held a conference with counsel for both defendants and the government to discuss the matter. I invited briefing on the question whether the court retains authority to issue restitution orders after such a delay, and supplemental briefs were submitted on August 13, 2015.

I conclude that the court does retain authority, and my ruling and order on restitution follows.

I.   Discussion

   A. Authority to Order Restitution

Under the Mandatory Victims Restitution Act of 1996 ("MVRA"), an order of restitution should be entered within 90 days of sentencing. 18 U.S.C. § 3664(d)(5). The Second Circuit has repeatedly made clear that failure to order restitution within 90 days will not prevent entry of a restitution order so long as the error is harmless. *See, e.g.*, *United States v. Zakhary*, 357 F.3d 186, 191 (2d Cir. 2004) (declining to reverse a restitution order despite "a district court's failure to determine identifiable victims' losses within ninety days . . . unless [the defendant] can show actual prejudice from the omission"); *United States v. Catoggio*, 326 F.3d 323, 329–30 (2d Cir. 2003) (applying same rule). More recently, the Supreme Court came to a similar conclusion, holding that "a sentencing court that misses the 90-day deadline nonetheless retains the power to order restitution—at least where, as here, the sentencing court made clear prior to the deadline's expiration that it would order restitution, leaving open (for more than 90 days) only the amount." *Dolan v. United States*, 560 U.S. 605, 608 (2010). *See also United States v. Gushlak*, 728 F.3d 184, 191–92 (2d Cir. 2013), *cert. denied*, 134 S. Ct. 1528 (2014) (discussing *Dolan* and applying the Second Circuit's harmless-error analysis).

Despite the longer delay here, those cases control. Both criminal judgments indicate that a written restitution order would follow, and the parties continued to brief and argue issues relating to restitution at multiple hearings. Additionally, the plea agreements and presentence reports indicated that restitution was mandatory by statute and would be imposed. The defendants were clearly on notice, and they have offered no argument that they were prejudiced by the delay—indeed, in light of the time value of money, the delay was likely only to their advantage. Moreover, as the Supreme Court noted in *Dolan*, defendants who face potential

prejudice from a delay can alert the court, or, in an extreme case, seek mandamus, 560 U.S. at 616–17, and the defendants did neither in this case.

Termini argues that the delay violates his due process rights. There is no doubt that prompt *sentencing* implicates due process, *United States v. Ray*, 578 F.3d 184, 199–200 (2d Cir. 2009), but it is not clear whether the delayed entry of a restitution order—which the defendant was told would be forthcoming when a sentence was otherwise timely imposed—implicates his rights in the same way. Even assuming that it does, the defendant would still need to show actual prejudice that is both "substantial and demonstrable," *id.* at 200, and, as I stated above, Termini has not done so, because there appears to be no prejudice.

In his supplemental brief, Dalicandro also argues that the issues of restitution in this case are too complex for determination. It is true that, by statute, mandatory restitution does not apply when "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process," 18 U.S.C. § 3663A(c)(3)(B), but those circumstances are not present here. Restitution in this case is not especially simple, as the length of this ruling suggests, but neither is it sufficiently burdensome on the sentencing process to outweigh the need to provide restitution to the victim, especially when compared with the complexity of other cases in which restitution was ordered.

Finally, both defendants argue that they cannot afford to pay restitution, but that fact is not sufficient to avoid entry of a restitution order. 18 U.S.C. § 3664(f)(1)(A) ("In each order of restitution, the court shall order to restitution to each victim in the full amount of each victim's losses as determined by the court without consideration of the economic circumstances of the defendant.").

B.  <u>The Court May Subtract Benefits Given to the Victim from Restitution Owed by the Defendant</u>

The MVRA requires a district court to order restitution to victims of specified offenses. Mandatory restitution "shall apply in all sentencing proceedings for . . . plea agreements relating to charges, for any . . . offense against property . . . including any offense committed by fraud or deceit." 18 U.S.C. § 3663A(c)(1)(A)(ii). Because they have pled guilty to wire fraud and conspiracy to commit wire fraud, Termini and Dalicandro are required to pay restitution to their victim(s).

For the purposes of the MVRA, a victim is defined as

> [A] person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2). Omega is therefore a "victim" under the MVRA.

The court must "order restitution to each victim in the full amount of each victim's losses as determined by the court." 18 U.S.C. § 3664(f)(1)(A). A court has no discretion to order restitution for anything less than the full amount of the loss. *United States v. Walker*, 353 F.3d 130, 133 (2d Cir. 2003). A court shall, however, subtract from the amount lost "the value (as of the date the property is returned) of any part of the property that is returned." 18 U.S.C. § 3663A(b)(1)(B)(ii).

The purpose of the MVRA is to make the victim whole again. *United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006). A sentencing court therefore may not order restitution that exceeds the victim's actual losses. *Id.* at 117; *see also United States v. Nucci*, 364 F.3d 419, 423–24 (2d Cir. 2004).

Dalicandro and Termini do not meaningfully dispute that they caused losses to Omega, nor that MVRA applies to their offenses; instead, they primarily argue that the restitution order should be reduced because Omega has subsequently recouped its losses or gained a benefit from the defendants' conduct. The Second Circuit has recognized that if a victim has recouped its losses in some way, or received some benefit from the defendants' actions, that amount should be subtracted from the final restitution award. *See United States v. Rodriguez*, 260 F. App'x 414, 416 (2d Cir. 2008) (holding that restitution owed by defendant convicted of filing a false tax return may need to be reduced for refunds the defendant provided his victims). That principle holds true even if the benefit to the victim comes in a different form than the original loss sustained. For example, *Boccagna* involved a defendant who had made a false statement to the United States Department of Housing and Urban Development ("HUD"). After the defendant defaulted on his loan, HUD sold the collateral it had acquired from him. *Boccagna*, 450 F.3d at 108 (holding that the sentencing court must subtract the value of foreclosed property from restitution owed to HUD as a victim of the defendant's false statements); *United States v. Oladimeji*, 463 F.3d 152, 153 (2d Cir. 2006) (observing that if the victim-bank had been able to recoup some of its loss through sale of property at issue in the offense, the court should subtract that amount from the restitution owed). Thus, if Omega received some benefit from Dalicandro and Termini, that benefit must be subtracted when calculating the restitution award.

The government argues that because Omega wanted its money spent for sprinkler installations, the restitution award may not be reduced by anything except money spent on sprinklers. Govt.'s Mem. Concerning Restitution 13–14 (3:09-cr-245 (SRU), doc. 37). What the government essentially argues is that the court should consider Omega's expectation damages, and compensate Omega because it did not get what it wanted in the form it wanted. But as the

Second Circuit has noted, "the MVRA is not the vehicle to obtain . . . expectation damages." *Boccagna*, 450 F.3d at 120. "Criminal restitution . . . is not concerned with a victim's disappointed expectations but only with his actual loss." *Id.*

Several sister circuits have held that a victim's right to restitution under the MVRA is calculated by subtracting *any* benefit given to the victim from loss sustained by the victim. *See, e.g.*, *United States v. Shepard*, 269 F.3d 884, 887–88 (7th Cir. 2001) (decreasing restitution award by the value of improvements defendant made to victim's home because "[i]t is no different in principle from taking the money from one of [the victim's] bank accounts and depositing it in another a week later. So long as [the victim] regained beneficial use of the property, it has been 'returned' as § 3663A(b)(1)(B)(ii) uses that term"); *see also United States v. Huff*, 609 F.3d 1240, 1249 (11th Cir. 2010) ("The Court must determine whether any value has been rendered to the victim in the form of a service or product that should be offset against the restitution amount."); *United States v. Allen*, 529 F.3d 390, 396–97 (7th Cir. 2008) (holding that restitution must be reduced by services the defendant provided the victims); *United States v. Matsumaru*, 244 F.3d 1092, 1109 (9th Cir. 2001) (holding that restitution must be reduced by property given by defendant to victim). In short, any amount of loss recouped by Omega must be reduced from the restitution award.

Accordingly, I consider Dalicandro and Termini's arguments regarding Omega's alleged recovery of its losses. To the extent that those arguments concern disputed questions of fact, I must resolve those disputes by the preponderance of the evidence. 18 U.S.C. § 3664(e). I have determined that, although there is some dispute regarding which party bears the burden of proof

7

in proving benefits to the victim,[2] the government would prevail in each argument regardless of which party must carry the burden.

1. *Payment of Provider Taxes*

All parties agree that a portion of the misappropriated funds was used to pay for state provider taxes on Haven homes.[3] The defendants argue that had they not paid a portion of the provider taxes, Omega would ultimately have had to do so. Thus, the defendants assert, their payment of the state taxes provided Omega with a tangible monetary benefit, and should be offset against the restitution loss. The government responds that Omega never was, and never would have been, responsible for provider taxes for its facilities. Therefore, according to the government, the payment of the provider taxes did not bestow a benefit on Omega.

The joint facts submitted by the parties largely support the government's version of events. For instance, the parties acknowledge that the Master Lease

---

[2] Under the MVRA, the "burden of demonstrating the amount of loss sustained by the victim as a result of the offense" lies with the government. 18 U.S.C. § 3664(e). The burden of demonstrating matters other than the victim's loss and the defendants' ability to pay, however, "shall be upon the party designated by the court as justice requires." *Id.*

The Second Circuit has, however, left unresolved the question of which party bears the burden to show benefits conferred on the victims as a set-off to restitution. *See Boccagna*, 450 F.3d at 120 n.9. Some courts have treated the calculation of benefits conferred on victims as calculations of the amount of loss sustained by the victim, and accordingly placed the burden with the government. *See United States v. James*, 564 F.3d 1237, 1247 (10th Cir. 2009) (putting the burden on the government to prove whether the victim's harm from fraudulent home loans had been offset by profit the victim made in selling a mortgage on the home); *United States v. Swanson*, 483 F.3d 509, 515 (7th Cir. 2007) (putting the burden on the government to prove the victim's total losses, subtracting any benefits received from the defendant's fraudulent activities). Other courts have ruled that the burden of proving a benefit to the victim falls into the "as justice requires" category. Those cases typically involve benefits to the victims in the form of civil settlements, and usually place the burden of persuasion on the defendant. *See United States v. Elson*, 577 F.3d 713, 734 (6th Cir. 2009) ("Because the defendant should know the value of any compensation he has already provided to the victim . . . the burden should fall on him to argue for a reduction in his restitution order.") (internal citations omitted); *United States v. Crawford*, 169 F.3d 590, 593 n.2 (9th Cir. 1999) (holding that burden of proving benefit to victim should fall on whomever justice so requires); *United States v. Parsons*, 141 F.3d 386, 393 (1st Cir. 1998) (burden falls on defendant to establish there was double recovery to victim); *United States v. Sheinbaum*, 136 F.3d 443, 449 (5th Cir. 1998) (same).

I conclude that, under either interpretation of the statute, the burden of persuasion in this case should lie with the government. Omega is the entity best able to answer whether it received a benefit. Because the government has collaborated with Omega to determine the amount of restitution owed, the interests of justice are best served by putting the burden on the government.

[3] Provider taxes are sometimes called "nursing home user fees." Throughout this opinion, I will refer to them exclusively as provider taxes.

> [W]as a 'triple net' lease, meaning that the Haven Trust, the Sublessees [including Haven Health Center of Soundview and Haven Health Center of Jewett City], and the Guarantors [Haven Eldercare, LLC and Haven Management, LLC] were responsible for payment of all taxes and maintenance of the leased properties.

Joint Stipulation of Facts ¶ 4. Notably absent from that list is Omega. Indeed, at the August 30 oral argument the defendants acknowledged that the provider taxes are a tax on the operator of a nursing home, not the person who owns the nursing home. Leighton Aiken, an attorney for the victim, testified that Omega was the owner, not operator, of the facilities in question. That testimony was undisputed.

The defendants next argue that even if Omega was not responsible for the provider taxes before Haven filed for bankruptcy, during the bankruptcy process, when a new operator assumed control of the facilities, Omega became responsible for those taxes. Again, the facts do not support the defendants' argument. In early July, 2008, TC Healthcare began operating the facilities. *Id.* at ¶ 29. At that time the Bankruptcy Court issued on order stating that TC Healthcare (not Omega) was responsible for both pre-petition and post-petition provider taxes. *Id.* at ¶ 31.

The defendants point to a provision of Connecticut law that states: "[U]pon the sale or transfer of a nursing home, the transferee will be liable for the nursing home user fee for the calendar quarter(s) for which the transferor filed or was required to file a form OP-336." *Id.* at ¶ 7. The defendants argue that Omega was transferred management of the properties from Haven, and thus should be considered a "transferee" under the law. The defendants acknowledged, however, that even under that theory, Omega would have been responsible for the provider taxes only momentarily. After Omega received control of the properties, it immediately transferred them to TC Healthcare. At that point, TC Healthcare became responsible for the provider taxes.

Because the responsibility for the provider taxes ultimately lay with TC Healthcare, the payment of those taxes did not confer a direct benefit on Omega.[4]

Termini, at the August 30 oral argument, advanced an additional theory under which Omega would have been responsible for the provider taxes. According to Termini, Omega was responsible for TC Healthcare's operating deficiencies after TC Healthcare assumed operating control over the facilities in question. Thus, to the extent that the taxes could have depleted TC Healthcare's funds and created an operating deficiency, Omega benefited from the payment of those taxes. But Termini's theory is too attenuated to warrant a reduction of the restitution award. At the time the provider taxes were due, Haven had a legal obligation to pay them. Later, they became TC Healthcare's responsibility. Although it is possible that if TC Healthcare had had to pay the provider taxes its books would have balanced differently and it would have incurred greater operating deficiencies, that theory is entirely speculative.

2. *Negotiations with TC Healthcare*

The defendants next argue that Omega received an indirect benefit from the defendants' payment of provider taxes. According to the defendants, even if Omega was never directly responsible for the provider taxes, it was almost certainly able to get more favorable lease terms with TC Healthcare than it would have if the provider taxes had not been paid.

The evidence introduced unequivocally shows that Omega received no benefit in its negotiations with TC Healthcare because the provider taxes had been paid. The defendants'

---

[4] The government advances another argument for why Omega was not responsible for paying provider taxes under the transferee theory. The Bankruptcy Court's July 4, 2008 order stated, "OHI (Connecticut), Inc. entered into the Purchase Agreements, including its purchase of the leasehold assets, 'being free and clear of any and all actual and contingent claims, liabilities, obligations or other monetary exposure related to provider taxes.'" *Id.* at ¶ 30. The defendants respond that the State may not have allowed those taxes to be waived if the provider taxes had not been paid, and there were more outstanding taxes the State could stand to collect. I need not resolve that theoretical debate, however, because the other facts presented are sufficient to show that Omega was never directly responsible for provider taxes.

argument to the contrary is based on supposition, not evidence. According to the defendants, logic dictates that the presence or absence of several thousand dollars of tax liability would alter negotiations between TC Healthcare and Omega.

The government, however, has introduced evidence that conclusively shows TC Healthcare's potential tax obligations did not enter—and would not have entered—into the negotiations between TC Healthcare and Omega. Aiken testified that, at the time the DIP Lenders' funding ended, there were no entities willing to buy the Haven properties. Both Omega and the State were eager to keep the facilities operational in order to ensure the wellbeing of the facilities' residents. According to Aiken, the State was reluctant to assume operation of the facilities because it thought that it had inadequate funds to do so. Omega was legally unable to run the facilities because it was a real estate investment trust and therefore not allowed to operate nursing homes. Omega thus turned to Timothy Coburn, who had been appointed by the Bankruptcy Court to assess patients' rights during the bankruptcy. In order to keep the facilities open, Coburn formed TC Healthcare and assumed operation. There were no lease negotiations between Coburn/TC Healthcare and Omega.[5]

I credit Aiken's testimony on this matter, particularly because no one has introduced evidence to the contrary. At the August 30 oral argument, Termini maintained that Omega and TC Healthcare must have debated TC Healthcare's tax obligations, because "I've been in enough rate negotiations to know what is on the table in these discussions." He admitted, however, that

---

[5] Aiken also testified that he does not believe the events surrounding TC Healthcare's operation of the facilities would have been different had Haven failed to meet its tax obligations. Regardless, Aiken testified, the pressure from the State for Coburn/TC Healthcare to begin operating the facilities was so great that Coburn/TC Healthcare would almost certainly have taken over the facilities under either situation. No party has disputed Aiken's testimony.
    According to the joint stipulation of facts, on or about September 1, 2008, Omega "entered into a lease agreement concerning certain facilities, including Soundview and Jewett City, with an entity known as Formation or Genesis, which operated the facilities from that date forward." (Dalicandro Dkt. No. 45, ¶ 33) No party argues that Omega received a benefit in its negotiations with Formation/Genesis as a result of the paid provider taxes.

he had no way to know what occurred during any negotiations, and his speculation is insufficient to dispute the credible evidence put forth by the government.[6]

### 3. *Installation of Soundview Sprinklers*

All parties agree that sprinklers were eventually installed at Soundview. The defendants argue that, because the sprinklers were eventually installed at Soundview, the cost of installing those sprinklers should be subtracted from the restitution award.

The sprinkler installation was completed in February 2009. At that time, a third party was operating Soundview, and Haven's involvement had ended.[7] The government has introduced no direct evidence of who paid for the Soundview sprinklers, but the circumstantial evidence clearly indicates that it was not Haven, Dalicandro, or Termini. After Haven declared bankruptcy in 2007, the Haven homes were kept afloat through an influx of DIP financing. Additionally, TC Healthcare assumed operation of Soundview in July 2008. Thus, it is implausible that the defendants paid for the Soundview sprinklers. Aiken has testified that the majority of the money spent on the Soundview sprinkler system was funded by Omega. Dalicandro, in a filing with the court, has stated that "[i]t is believed that [Soundview] sprinklers were primarily funded by DIP financing." (Dalicandro does not elaborate on what he means by "primarily."). Finally, Termini has acknowledged that the sprinklers were funded through the DIP financing.[8]

---

[6] The government also argued that had there been any lease negotiations, the lack of installed sprinklers would have disadvantaged Omega. I need not consider how that would have influenced any negotiations, however, because I credit the testimony that there were no such negotiations.

[7] The joint facts stipulate that the sprinklers were completed in February 2009. In a later filing Termini stated that he did not know if that was true, but he introduced no evidence to the contrary. In any event, Termini's alternative timeline would also indicate that the sprinkler-installation *began* after Haven's involvement had ended—he placed the beginning of the installations in January 2009, and DIP financing had already begun at that time.

[8] Termini attempts to argue that although the sprinklers were financed by DIP financing, Haven should be credited for that money. That is because, he argues, the DIP financing was obtained through consideration for the Haven homes. This argument is unpersuasive since Omega owned the facilities themselves—Haven only operated them.

The defendants argue that even if they did not pay for the Soundview sprinklers, the fact that a third party (namely, the other contributors to the DIP financing) paid for at least part of them demonstrates that Omega is not entitled to restitution for the Soundview sprinkler funds. To hold otherwise, the defendants argue, would allow for Omega's double recovery. That argument is flatly incorrect. As the government points out, because of the defendants' fraud, Omega essentially paid twice for the same sprinkler installation. *See* Gov't. Mem. Concerning Restitution at 15 (observing that, "using Dalicandro's figures, Omega has paid about $1,412,090 for $456,000 in sprinkler installation"). That it may have paid less than the full price the second time because of third-party contributions does not in any way change the fact that it received no value for its first payment.

The defendants next argue that the restitution award should be reduced by the amount spent on the Soundview sprinklers because the State ought to have reimbursed Omega for the installed sprinklers. As an initial matter, the evidence suggests that Omega was never reimbursed by the State for the Soundview sprinklers. Aiken testified that one of the post-Haven operators, rather than Omega, would have been reimbursed for the sprinklers. Neither Dalicandro nor Termini contest that testimony, and both admit that they have no knowledge whether Omega was reimbursed. Even if Omega *was* reimbursed, that does not help Termini or Dalicandro's case. Dalicandro has submitted to the court that his understanding of Omega and Haven's original lending arrangement was that "Haven would be reimbursed by the State 100% of its costs once it expended 80% of the sprinkler funds; Haven would then reimburse Omega." Therefore, it appears that Omega's expectation was that, in exchange for lending Haven money for sprinklers,

13

it would receive (1) installed sprinklers, and (2) reimbursement for its original investment.[9] It does not matter that, based on the actions of Omega and a third party, it has now received the second expectation.

### 4. *Omega's Receipt of Collateral*

The defendants next argue that Omega did not suffer any pecuniary harm as a result of the defendants' actions, because the Soundview and Jewett City facilities were the underlying collateral for the loan, and that collateral was never harmed. The evidence presented contradicts that argument. The joint stipulation of facts states that the loan between Haven and Omega was to be repaid by an increase in base rent (not by a disposition of collateral). Similarly, Aiken testified that there was no security interest in the loan: the money was to be recouped by increased rent, *not* by the option to assume ownership of Soundview and Jewett City (which Omega already owned).[10] Therefore, I decline to reduce the restitution award on the basis of the "receipt of collateral" argument.

### C. Apportionment of Restitution

Because more than one defendant in this case has contributed to Omega's loss, I must decide whether to "make each defendant liable for payment of the full amount of restitution," or

---

[9] This interpretation is supported by the government, which has submitted that Omega lent the money in question with the understanding that it would be made up for in increased base rent. That, of course, did not happen, because Haven declared bankruptcy soon thereafter.

[10] Dalicandro notes that Omega made a credit bid to take the properties out of the Haven Chapter 11 bankruptcy proceedings, but as the government counters, Soundview and Jewett City were not themselves part of the bankruptcy estate. The bankruptcy estate only contained that which Haven owned: the Haven entities that operated Soundview and Jewett City, and their leasehold interests. The leasehold interests are what Omega assumed in bankruptcy.

    In his brief dated June 18, 2010, Termini makes a one-sentence argument that "the funds loaned by Omega to Haven for the sprinkler system at Jewett City remained part of the company's assets and, therefore, ultimately went to Omega." This argument is also belied by the facts: as noted above, Haven declared bankruptcy and was for a time only kept afloat by an influx of cash by outside entities, including Omega. There is no evidence to support the argument that, despite its dire financial situation, Haven had a surplus of money that was transferred to Omega.

14

to "apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

Traditionally, section 3664(h) is applied where there are multiple defendants in one case, or under one indictment. *See, e.g.*, *United States v. Aumais*, 656 F.3d 147, 156 (2d Cir. 2011) (noting, in dicta, that "joint and several liability may be imposed only when a single district judge is dealing with multiple defendants in a single case (or indictment)," and that "it would seem that the law does not contemplate apportionment of liability among defendants in different cases, before different judges, in different jurisdictions around the country"); *United States v. McGowan*, 380 F. App'x 487, 490–91 (6th Cir. 2010) (holding that it was not error to hold defendant liable for entire restitution, because although other individuals participated in the criminal scheme, defendant was only individual charged in indictment); *United States v. Channita*, 9 F. App'x 274, 274–75 (4th Cir. 2001) (same).

Here, Termini and Dalicandro are proceeding in separate cases, and were charged in separate Informations. Nevertheless, this is clearly the type of situation envisioned by section 3664(h). Although the defendants were not charged in the same indictment, that is due in part to the fact that both waived their right to indictment. *See United States v. Donaghy*, 570 F. Supp. 2d 411, 437 (E.D.N.Y. 2008), *aff'd sub nom. United States v. Battista*, 575 F.3d 226 (2d Cir. 2009) (imposing joint and several liability for harm caused by a conspiracy where one defendant waived indictment, and the other two were indicted jointly); *see also United States v. Bengis*, 783 F.3d 407, 414 (2d Cir. 2015) (same, apparently across multiple indictments). They are charged with furthering the same criminal scheme—accordingly, under Rules 8 and 13 of the Federal Rules of Criminal Procedure, they could have been joined in the same indictment or tried together even if they were indicted separately. Moreover, Termini and Dalicandro both appeared

before the same district judge, and their restitution hearings were conducted jointly. This is not a case, like *Aumais*, involving defendants from jurisdictions throughout the country. It is also not a case, like *McGowan* or *Channita*, dealing with both charged and uncharged individuals. Indeed, none of the parties in this case has disputed the applicability of section 3664(h). As such, I conclude that section 3664(h) applies here.

The defendants' respective Informations demonstrate that both were integral to the fraud. Both defendants met with representatives from Omega in 2007, in part to discuss whether Omega would provide funds for capital improvements to the fire sprinkler systems at Jewett City and Soundview. Dalicandro also submitted and caused to be submitted to Omega misleading vendor invoices and checks to vendors that purported to represent deposits required to begin sprinkler improvement work at Jewett City and Soundview. Termini personally signed the Master Lease, in which Omega agreed to provide funds for capital improvements and renovations to the fire sprinkler system at Jewett City and Soundview. As the Chief Executive Officer for Haven, Termini not only abused his position of power, but also benefited more than Dalicandro from the fraud.

Accordingly, I order the full restitution amount of $956,090 be paid by each of the defendants, Raymond Termini and Fred Dalicandro. Each defendant is required to pay up to the amount of the respective defendant's listed restitution obligation until the aggregate monies paid by both defendants total $956,090. At that point, the restitution obligation of both defendants will be satisfied.

D. <u>Payment Schedule</u>

The full amount of restitution is due and payable immediately, though I acknowledge the defendants' financial inability to pay that amount at present and so I will order periodic payments. I now set out a restitution schedule for each defendant. 18 U.S.C. §§ 3664(f)(2) –(3).

1. *Dalicandro*

I have considered all of the evidence regarding Dalicandro's financial circumstances and ability to pay. Given the limitations on his ability to pay, I determine that a schedule of periodic payments is appropriate for Dalicandro's restitution obligations. Beginning immediately upon entry of this Order, Dalicandro shall pay the greater of $250 or 10% of his gross personal income on a monthly basis to the Clerk of Court until the amount he owes is satisfied.

2. *Termini*

I have considered all of the evidence regarding Termini's financial circumstances and ability to pay. Given the limitations on his ability to pay, I determine that a schedule of periodic payments is appropriate for Termini's restitution obligations. Beginning immediately upon entry of this Order, Termini shall also pay the greater of $250 or 10% of his gross personal income on a monthly basis to the Clerk of Court until the amount he owes is satisfied.

Separately I note that on April 28, 2010, I ordered that Termini forfeit $500,000 as proceeds derived from his unlawful activity, to the government. (doc. 22) Under 18 U.S.C § 981(e)(6), the Attorney General may "transfer [forfeited] property . . . as restoration to any victim of the offense giving rise to the forfeiture." Although the government is not *required* to apply any payments that Termini makes toward the forfeiture award to reduce his restitution obligation, Omega may seek such relief, and the Attorney General may apply one payment as credit against the other obligation. *United States v. Torres*, 703 F.3d 194, 204–05 (2d Cir. 2012).

E.  Method of Payment

Payment may be made in the form of cash, check or money order. All payments by check or money order shall be made payable to the "Clerk, United States District Court," and each check shall be delivered to the United States District Court, Attention: Clerk's Office, 915 Lafayette Boulevard, Bridgeport, CT 06604, as required by 18 U.S.C. § 3611. Each defendant shall write the docket number of his case on each check delivered to the Clerk's Office. Any cash payments shall be hand delivered to the Clerk's Office using exact change, and shall not be mailed.

Payments shall be made in accordance with the District's Standing Order on the Disbursement of Restitution Payments by the Clerk of Court.

1.  *Additional Collection Provisions*

Each defendant shall notify the Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, of any material change in his economic circumstances that might affect his ability to pay restitution in accordance with 18 U.S.C. § 3664(k). Each defendant shall notify the Court, the United States Probation Office (during any period of probation or supervised release), and the United States Attorney's Office, of any change in address.

Nothing in this order shall prevent the victims or the United States from pursuing immediate collection through civil remedies allowed by law in accordance with 18 U.S.C. § 3664(m).

Each defendant shall pay toward any restitution still owed the value of any substantial resources he receives from any source, including inheritance, settlement, or other judgment in accordance with 18 U.S.C. § 3664(n).

The liability to pay restitution shall terminate the later of 20 years from the entry of this order or, for each defendant, upon his death.

## II.    Conclusion

For the reasons stated above, the government's request for restitution is **granted**. Dalicandro and Termini are jointly and severally responsible for making $956,050 in restitution to Omega through the court.

So ordered.

Dated at Bridgeport, Connecticut, this 15th day of January 2016.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge